**UNITED STATES of America,
Plaintiff,**

v.

**W.R. GRACE, Alan R. Stringer, Henry A. Eschenbach, Jack W. Wolter, William J. McCaig, Robert J. Bettacchi, O. Mario Favorito, Robert C. Walsh, Defendants.**

No. CR 05–07–M–DWM.

United States District Court,
D. Montana.

Jan. 11, 2005.

See, also, 2005 WL 2244820.

Angelo J. Calfo, Michelle K. Peterson, Yarmuth Wilsdon Calfo, Seattle, WA, Michael F. Bailey, Bailey & Antenor, Missoula, MT, David S. Krakoff, Gary A. Winters, Mark Holscher, Mayer Brown Rowe Maw Llp, Washington, DC, Ronald F. Waterman, Gough Shanahan Johnson & Waterman, Helena, MT, Jeremy Maltby, O'Melveny & Myers, Los Angeles, CA, William A. Duerk, Michael J. Milodragovich, Milodragovich Dale Steinbrenner & Binney, Missoula, MT, Elizabeth Van Doren Gray, Sowell Gray Stepp & Lafitte, Columbia, SC, Palmer A. Hoovestal, Hoovestal Kakuk & Fanning, Helena, MT, William A. Coates, Roe Cassidy Coates & Price, Greenville, SC, David E. Roth, Bradley Arant Rose & White Llp, Birmingham, AL, Stephen A. Klein, Spriggs & Hollingsworth, Stephen R. Spivack, Bradley Arant Rose & White, Washington, DC, Aimee M. Grmoljez, Catherine A. Laughner, Browning Kaleczyc Berry & Hoven, Helena, MT, for Defendants.

David M. Uhlmann, Kevin Cassidy, Thomas L. Sansonetti, U.S. Dept of Justice, Washington, DC, Kris A. McLean, Office of the U.S. Attorney, Missoula, MT, William W. Mercer, Office of The U.S. Attorney, Billings, MT, for Plaintiff.

## ORDER

MOLLOY, Chief Judge.

### I. Introduction

Before the Court are two motions to change venue, one filed by Defendant

Grace and the other filed collectively by the individual Defendants.[1] The Defendants argue that pretrial publicity has prejudiced the jury pool of this District to such an extent that a change of venue to a location outside the District of Montana is necessary to insure that they receive a fair trial. In support of their motion, the Defendants have provided the Court a significant sample of local media coverage as well as several books and documentary films based on the events in Libby. Not all of the material bears on the venue question to be resolved in this Order. The Defendants have also presented evidence of a telephone survey which they argue demonstrates an ongoing bias against them among prospective Montana jurors. Expert analysis of the media coverage and the survey is also included among the materials supporting the Defendants' motion.

The government opposes the motion to change venue and contends that the Defendants have failed to meet their burden to show that bias among the jury pool is so prevalent as to warrant a change of venue. Much of the media coverage cited by the Defendants is several years old and the prosecution argues that most of the coverage is not inflammatory but rather factual in nature. The government takes the position that the voir dire process is the proper means of assessing the extent of realized juror bias, and that the Court should refrain from deciding the motion to change venue until it has attempted to impanel a fair jury in this District.

The implicit question presented by the pending motions is whether there are twelve [2] citizens in the Missoula Division of the federal court who can judge the evidence fairly. We do not expect to try the case to jurors who are ignorant; indeed, an informed citizenry is essential to all aspects of governance including jury service. What we do expect is twelve people who can intellectually realize the importance of not prejudging the case-not only from the prospective of the prosecution, but equally if not more importantly from the point of view of the accused. Proof of illegal conduct is the *sine qua non* to finding guilt, and that conduct must be proven to have occurred with the necessary mental culpability. The case against W.R. Grace and the individual Defendants will not be decided by personal likes or dislikes, opinions, prejudices, or sympathy. Each of the Defendants, from the corporation to the individuals, is presumed innocent. That presumption means acquittal unless and until the contrary is proven beyond a reasonable doubt. My thirty years of experience in Montana as a lawyer, and as a judge, convince me that we are up to the task and that the citizens here will not decide the case based on news accounts. They will be fair and they will require the government to meet the heavy burden imposed on it by the Constitution and laws of these United States.[3]

1. Because the individual Defendants' motion to change venue merely emphasizes points raised in Grace's motion, this Order will consider the two requests as a single motion unless otherwise noted.

2. As of the date of this Order there are 14,282 prospective jurors in the Missoula Division. As is discussed in this Order, disqualification of jurors from the Missoula Division of the court is not warranted by any proof presented at the hearing.

3. The Clerk of the District Court for the District of Montana recently determined that of all criminal cases tried in the federal courts in Montana between June 30, 2003 and October 31, 2005, the government has failed to garner convictions on all counts in nearly 50 percent of the cases it tries. The numbers show that under the administration of the current United States Attorney during the time period cited above, 23 percent of the cases tried result in outright acquittals on all counts charged. In another 23 percent of the cases tried, the defendant is acquitted on one or more of the counts charged. After mistrials on a small percentage of cases, in recent years the government has only been able to

For the reasons that follow, I .conclude that the Defendants have failed to meet the heavy burden of showing that pretrial prejudice is so great that it is impossible for the Court to seat a fair and impartial jury in the Missoula Division of the District of Montana.

## II. Materials Submitted by the Defendants

The Defendants have submitted voluminous materials in support of their motion to transfer venue, including:

— over 1,900 newspaper articles and other written accounts of the events involving Grace's mine in Libby;

— a compilation of recent television news coverage of the events in Libby;

— two documentary films focusing on the Libby asbestos situation;

— two books examining Grace's role in the Libby asbestos situation;

— results of a telephone survey conducted in four of the five divisions of the district of Montana; and

— expert reports analyzing the results of the telephone survey and the effect of the news coverage on the jury pool.

The expert report of Dr. Edward J. Bronson[4] evaluates the quantity and the character of the pretrial publicity for purposes of determining whether the coverage is so pervasive and prejudicial as to endanger the possibility that the Defendants will receive a fair trial in this district. Dr. Bronson's analysis focuses on articles from the Missoulian as representative of the broader coverage throughout the. district. According to Dr. Bronson, the coverage of the events relating to this case has been extensive over the past six years, although the bulk of the coverage occurred during the years 2000–01. Dr. Bronson reports that of the 360 articles published in the Missoulian since 1999, only 40 were published within the last eighteen months.

Even though the bulk of the coverage of the Libby mine in this district is several years old, Dr, Bronson concludes that it is likely to cause a significant bias against the Defendants among the potential jurors exposed to the coverage. He opines this is because the coverage has established generally what Dr. Bronson calls a "story model," or framework within which the reader processes information about the case. The story model of this case, according to Dr. Bronson, is one of good versus evil, in which Grace is invariably portrayed as the villain. Dr. Bronson finds this story model prejudicial in part because it persists, according to his opinion, even after a reader has forgotten specific details of the case. Thus, the theory goes, as time passes an individual who has been exposed to the story model will "fill in the blanks" of forgotten details with information that fits within the model. It is partly on this basis that Dr. Bronson concludes that the passage of time will do little to cure the prejudice caused by the coverage. His conclusion in that regard is also based in part on his contention that each new article will stir up a reader's deeply held animosity toward Grace, in what he calls a "peeling off the scab" phenomenon. Because of the likelihood of continuing coverage throughout this case, Dr. Bronson opines that the public hostility toward Grace will remain strong until the trial.

According to Dr. Bronson, the individual Defendants are just as likely as Grace to

convict on all counts charged in 50 percent of the cases it tries. These numbers can be interpreted in a number of ways, but one certainty that stems from them is that Montana jurors take their obligation seriously and

they do believe in the presumption of innocence.

4. The Bronson Affidavit is attached to Grace's Motion to Change Venue as Exhibit V.

be prejudiced by the coverage he cites because of the strong tendency among jurors to infer guilt by association. In this case, Dr. Bronson opines that the individual Defendants are prejudiced by pretrial publicity despite their general lack of name recognition because jurors will impute Grace's conduct to the individual Defendants. Dr. Bronson calls this a "spillover effect." Based on his opinions, Dr. Bronson recommends that venue be transferred outside the District of Montana.

Dr. Daniel J. Denis[5] analyzed the results of a survey designed to measure public opinion in Montana with the goal of ascertaining whether in his opinion the Defendants can receive a fair trial here, concluding that there is "intense bias" against the Defendants in Montana. Dr. Denis emphasized the following findings:

— 92% of respondents had been exposed to news stories about Grace and Libby

— 55% of those surveyed believe Grace is guilty of the charges in the Indictment, with 90% of those believing in Grace's guilt strongly

— 53% of those surveyed believe the individual Defendants are guilty of the charges in the Indictment, with 88% of those holding that view strongly

Dr. Denis also notes that the study showed that those who have read or heard news coverage of the case were roughly twice as likely to believe in the Defendants' guilt as those who had not been exposed to the coverage. From these figures Dr. Denis concludes that the jury pool is strongly biased against the Defendants and that continued exposure to media coverage will strengthen that bias.

Dr. Donald E. Vinson[6] designed the study analyzed by Dr. Denis. Dr. Vinson's report comes into play in this case because in his view, the voir dire process is not sufficient to root out bias among potential jurors. Dr. Vinson holds the opinion, at odds with my experience, that a juror is unlikely to reveal a bias in a public setting before his fellow citizens and a federal judge, as there is strong pressure to offer the socially acceptable response affirming one's ability to be impartial. Dr. Vinson also reports anecdotal incidents in which those with strong views concealed bias in order to get on the jury in an effort to influence the verdict. While those anecdotes may be true, they are not helpful in analyzing pretrial publicity. Finally, Dr. Vinson cites a study showing that the types of questions asked (i.e., leading questions, frequently repeated many times) during voir dire are not likely to lead to genuine and direct responses regarding juror bias. Based on his opinions and Dr. Denis' conclusions regarding the level of bias in the jury pool, Dr. Vinson concludes that voir dire will not be effective in screening biased jurors in this case.

### III. Background and Factual Findings[7]

#### *The Timing and Extent of Media Coverage*

1. Most the media coverage of the events in Libby was reported in 2000 and 2001. *See* Govt. Hrg. Ex. 1; Bronson Testimony, Tr. at 27 ("a lot of publicity occurred in the early stages, four, five, six years ago"). The years 1999 to 2001 account for nearly 73 percent of all articles in Montana collected by defense counsel. The trial is set for September 11, 2006,

5. The Denis Affidavit is attached to Grace's Motion to Change Venue as Exhibit X.

6. The Vinson Affidavit is attached to Grace's Motion to Change Venue as Exhibit W.

7. The Court's findings of fact are not intended to be confined to this recitation. Further factual findings are contained in the Analysis section of this opinion.

five to six years after most of the coverage was published.

2. There was a decline in media coverage of the events in Libby after 2001, and since then, the media coverage has been less than what was seen in 1999 through 2001. *See* Govt. Hrg. Ex. 1; Bronson Testimony, Tr. at 42.

3. One thousand six hundred thirty-two Montana articles were submitted by defense counsel. Not all were reviewed by Dr. Bronson. Defendants' Hrg. Ex. 3. Some of the articles are "wire" duplicates of published articles in other news sources.

4. The record contains 846 articles published in the Missoula Division for which dates of publication are known. This combined total includes articles from four newspapers: The Missoulian (Missoula, MT—circulation: 30,066; 355 articles); The Western News (Libby, MT—circulation: 4,200; 400 articles); The Daily Inter Lake (Kalispell, MT—circulation: 15,600; 67 articles); and The Missoula Independent (Missoula, MT—circulation: 25,000; 24 articles). *See* Ex. A to Grace's Opening Brief; Ex. A to Grace's Reply Brief. There are 14,282 eligible jurors in the Missoula Division jury pool.

5. The Western News is published semiweekly. The Missoula Independent is a free weekly newspaper. *See* Ex. A to Grace's Opening Brief.

6. Of the articles collected by defense counsel from the Missoula Division, nearly 88 percent were reported before September of 2003. *See* Ex. A to Grace's Opening Brief; Ex. A to Grace's Reply Brief.

7. A combined total of 79 newspaper articles have appeared in the four newspapers of the Missoula Division in the past eighteen months. *Id.*

8. The defendants presented no evidence of readership habits of those who subscribe to the various newspapers from which the articles were collected. In Dr. Bronson's affidavit, he asserts many people who receive a newspaper "do not read every day or they read only a portion of the newspaper, even just the sports page." Bronson Aff., ¶ 22.

9. The Defendants submitted a compilation of 42 television news stories appearing within the past ten months. *See* Ex. B to Grace's Opening Brief; Ex. H to Grace's Reply Brief.

10. Several of the stories are duplicate stories run during multiple newscasts in a single day or by multiple network affiliates on the same day. *See* Ex. B to Grace's Opening Brief, Items 6, 8, 9, 17, 18, 21–23; Ex. H to Grace's Reply Brief, Items 12, 15 and 16. It is therefore likely that even a regular viewer of local news broadcasts would have seen only a fraction of the stories collected.

11. Of the 42 television news stories, 23 (55 percent of the total) appeared in February and March of 2005 and relate to the filing of the Indictment, the Defendants' entry of pleas of not guilty, and the March 9 Scheduling Conference. Thus, in the past eight months, only 19 news stories have appeared on all Missoula Division television stations combined.

12. The defendants presented no evidence of the viewership in Montana of any of the broadcast media they submitted for the Court's consideration.

### Dr. Bronson's Testimony

13. During the December 1, 2005 hearing, the Defendants called on Dr. Edward J. Bronson to provide expert testimony regarding the effect of pretrial publicity on venue in this case. He is the only expert who testified for the defense and consequently the only one whose views were tested by cross-examination.

14. Dr. Bronson is a college professor emeritus at California State University in Chico. Bronson Testimony, Tr. at 7.

15. Dr. Bronson has been qualified as an expert to testify in state and federal courts, primarily in California, on issues concerning the effect of pretrial publicity on venue. Bronson Testimony, Tr. at 8.

16. Dr. Bronson has testified as an expert witness regarding change of venue motions based on pretrial publicity in 112 cases. Bronson Testimony, Tr. at 9. Dr. Bronson has testified mainly for defendants who are seeking a change of venue. *Id.*

17. At the December 1, 2005 hearing, this Court recognized Dr Bronson was qualified to give opinions about the prejudicial effect of pretrial publicity. The government did not dispute Dr. Bronson's qualifications as an expert. Bronson Testimony, Tr. at 10.

18. At the Defendants' request, Dr. Bronson performed a content analysis of news articles related to this case. Bronson Testimony, Tr. at 10–11.

19. Content analysis is a technique used by social scientists to systematically analyze material by establishing evaluative criteria and then measuring the material with respect to the criteria. Bronson Testimony, Tr. at 11. In theory, this process permits the analyst to draw certain conclusions regarding the material, such as whether it is predominately prejudicial in nature. *Id.*[8]

20. Dr. Bronson's content analysis consisted of approximating both the extent and substance of print news coverage related to this case. Bronson Testimony, Tr. at 11; Bronson Aff. at ¶ 13.

21. The articles examined by Dr. Bronson span the time from November 1999, when asbestos issues in Libby became known through a series of reports in the Seattle Post–Intelligencer, until November 2, 2005, when W.R. Grace filed its Reply to the Government's Response to the Motion to Transfer Venue. Bronson Aff., ¶ 15.

22. The number of articles in each of the largest newspapers in the venues analyzed by Dr. Bronson is as follows: Missoulian—359; Helena Independent Record (Helena, Montana)—351; Montana Standard (Butte, Montana)—225; Great Falls Tribune (Great Falls, Montana)—97; Denver Post (Denver, Colorado)—9; Idaho Statesman (Boise, Idaho)—2; Desert News (Salt Lake City, Utah)—4; Star Tribune (Minneapolis/St.Paul, Minnesota)—37; Seattle Post–Intelligencer (Seattle, Washington)—100. Defendants' Hrg. Ex. 2, 4.

23. The extent of coverage has been minimal in nearly all of the alternate venues examined as part of Dr. Bronson's content analysis. Bronson Testimony, Tr. at 16. The only exception is Seattle, where Libby's asbestos problems first gained notoriety. *Id.*

24. Defense counsel specifically instructed Dr. Bronson not to analyze the media coverage collected from the Billings Gazette. Bronson Testimony, Tr. at 48. Billings has the largest population of any city in Montana. The Billings Gazette has the largest circulation of any newspaper in Montana. By defense counsel's own collection, the Billings Gazette published the fewest articles on the events in Libby of

8. There was a great deal of discussion about "content analysis" during the hearing, but there was no real proof as to what it involves. That is, what is the methodology used and why is it relevant to the case at hand? It is not clear that the methodology used would pass muster as Dr. Bronson did not articulate why some articles were analyzed more closely than others nor did he indicate what variables were critical to his analysis. The unit of data collection was ill defined and measured not by empirical analysis but by what I call "adverb and adjective" analysis, a measure that is nebulous at best. The absence of an articulated coding mechanism is problematic because it leaves room for subjective analysis.

any major newspaper in Montana. *See* Defendants' Hrg. Ex. 1. At most, only 68 articles appeared in the Billings Gazette from 1999 through 2005. *Id.;* Bronson Testimony, Tr. at 52.

25. Dr. Bronson *skimmed* all of the articles that were collected from the Missoulian, and focused on "about a third of them" for his qualitative analysis. Bronson Testimony, Tr. at 36, 78. The defense presented no evidence as to which third of the articles Dr. Bronson focused on for his analysis; nor was there any explanation about why specific articles were excluded or included.

26. The defense presented no evidence that Dr. Bronson conducted a qualitative analysis of any of the other news coverage that was collected, including print coverage in other newspapers in the Missoula Division.

27. There are very few articles in the collection reviewed by Dr. Bronson that exculpate W.R. Grace or the individual Defendants. Bronson Aff., ¶ 51.

28. Dr. Bronson acknowledged there are many tools available to the Court to help ensure a fair and impartial jury, including: juror questionnaires; potential individualized and sequestered voir dire; jury instructions; assembling a larger than normal jury pool; an increased number of peremptory strikes; and importing jurors from outside the Missoula Division. Bronson Testimony, Tr. at 49–50.[9]

29. Dr. Bronson was not asked to give his opinion as to whether any of these remedies or a combination of them would help to ensure the selection of a fair jury in this case. Bronson Testimony, Tr. at 50–51.

30. Dr. Bronson did not read transcripts of any voir dire conducted by the Court in other cases. Bronson Testimony, Tr. at 87.

31. The defendants presented no evidence of media coverage of other high profile cases in Montana for comparative purposes. Bronson Testimony, Tr. at 86. The survey commissioned by the defendants indicated that more than 60 percent of respondents thought that the events in Libby received about the same or less coverage than other news stories involving issues in the State of Montana. Denis Aff., p. A–3, Q17.

32. Dr. Bronson reviewed a television news broadcast that aired on a local Missoula news channel, KECI–TV, at 6:00 and 10:00 p.m. on November 17, 2005. Bronson Testimony, Tr. at 17. The broadcast ran for fourteen minutes. *Id.* at 19.

33. The KECI broadcast implies that W.R. Grace is culpable for the asbestos contamination in Libby. The broadcast portrays an asbestosis sufferer and former vermiculite mine worker, Les Skramstad, and it contains interviews with Libby residents who hold Grace responsible for the contamination. Relying on documents purporting to be internal company memoranda from Grace, the broadcast implies that the company was aware of the dangers posed by conditions in the Libby Mine, yet never told the miners about those dangers.

34. The KECI broadcast failed to make it clear that W.R. Grace did not own the vermiculite mine in Libby when Mr. Skramstad worked there, and it failed to note that Mr. Skramstad was exposed to asbestos 15 years before the Defendants' allegedly criminal conduct occurred. Defendants' Hrg. Ex. 9; Bronson Testimony, Tr. at 24.

35. The defendants presented no evidence regarding viewership in Montana or in the Missoula Division of the KECI news broadcast.

---

9. Peremptory challenges in this case are governed by Rule 24(b) & (c)(4), Fed.R.Crim.P.

36. The defendants presented no evidence that Dr. Bronson reviewed or analyzed any television news accounts other than the KECI feature.

### The Defendants' Telephone Opinion Poll

37. Defendants also presented evidence by way of affidavits (Dr. Denis and Dr. Vinson) about a survey commissioned to measure public opinion and attitudes concerning the defendants in this case. The government presented evidence by way of affidavits (Dr. New and Marla J. Goodman) to challenge the methodology of the defendants' survey, as well as the manner in which it was implemented.

38. Neither the defendants' nor the government's affiants associated with the survey testified at the venue hearing. Consequently, the parties were unable to cross-examine the expert witnesses regarding their qualifications, their opinions and the bases therefor, or the methodology used in conducting the survey. The Court was unable to question the affiants or observe their demeanor while testifying.

39. Like Dr. Bronson's media content analysis, the individual defendants' survey did not include the Billings Division. Denis Aff., ¶ 9.

40. The defendants' survey indicates that of those surveyed, 45 percent of respondents do not believe that W.R. Grace is guilty of a cover-up at Libby. Denis Aff., p. A–4, Q25. The survey indicates that more than 47 percent of respondents do not believe that the individuals charged in the case are guilty of a cover-up at Libby. *Id.* at Q27.

## IV. Analysis

### A. Legal Standard

Article III of the United States Constitution says that "[t]he trial of all crimes . . . shall be held in the state where the said crimes shall have been committed." U.S. Const. Art. III, sec. 2. The Sixth Amendment states that in all criminal prosecutions, the accused shall be tried "by an impartial jury of the State and district where the crime shall have been committed." Those constitutional standards are reflected in Rule 18, Fed. R.Crim.P., which provides:

> Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed. The court must set the place of trial within the district with due regard for the convenience of the defendant and the witnesses, and the prompt administration of justice.

The Due Process clause of the Fifth Amendment requires fundamental fairness in the prosecution of federal crimes. U.S. Const. Amend. V ("no person shall be . . . deprived of life, liberty, or property, without due process of law"). Where the Sixth Amendment's guarantee of a trial in the state and district of the offense conflicts with the fundamental fairness requirement of the Due Process clause of the Fifth Amendment, the fundamental fairness requirement prevails. Thus, Rule 21(a), Fed.R.Crim.P. provides, "Upon the defendant's motion, the court must transfer the proceeding against the defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." [10]

---

**10.** The Advisory Committee's notes to Rule 21 imply that a defendant's right to a fair and impartial jury supercedes his right to be tried in the state and district of the alleged offense:

> The rule provides for a change of venue only on defendant's motion and does not extend the same right to the prosecution, since the defendant has a constitutional right to a trial in the district where the offense was committed, Constitution of the United States, Article III, § 2, Par. 3; Amendment VI. By making a motion for a change of venue, however, the defendant waives this constitutional right.

A district court has wide discretion in deciding whether to grant a motion to change venue under Rule 21(a). *United States v. Rewald,* 889 F.2d 836, 863 (9th Cir.1989). However, "a court must grant a motion to change venue 'if prejudicial pretrial publicity makes it impossible to seat an impartial jury.'" *Daniels v. Woodford,* 428 F.3d 1181, 1210 (9th Cir.2005)(quoting *Ainsworth v. Calderon,* 138 F.3d 787, 795 (9th Cir.1998)).

■ "A defendant need only demonstrate one of two different types of prejudice in support of a motion to transfer venue: presumed or actual." *United States v. Sherwood,* 98 F.3d 402, 410 (9th Cir.1996). "Prejudice is presumed when the record demonstrates that the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime." *Harris v. Pulley,* 885 F.2d 1354, 1361 (9th Cir.1988) (citations omitted). The Ninth Circuit has also defined presumed prejudice as occurring when "the adverse publicity is so pervasive and inflammatory that the jurors cannot be believed when they assert that they can be impartial." *United States v. Croft,* 124 F.3d 1109, 1115 (9th Cir.1997) (citation omitted). Actual prejudice requires a showing by the defendant that the jurors impaneled in his case exhibited "actual partiality or hostility that could not be laid aside." *Harris,* 885 F.2d at 1363 (citing *Murphy v. Florida,* 421 U.S. 794, 800, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975)).

Because this motion comes before the start of jury selection and trial, the Defendants must demonstrate presumed prejudice. In the absence of proved presumed prejudice, the case must be tried in Missoula unless actual prejudice exists when a Missoula jury is impaneled.

■ The presumed prejudice principle is rarely applicable and is reserved for an "extreme situation." *Harris,* 885 F.2d at 1361 (citation omitted); *Daniels,* 428 F.3d at 1211. The existence of presumed prejudice must be based on the facts and circumstances of each case. *See Irvin v. Dowd,* 366 U.S. 717, 721, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) ("the necessity for transfer will depend upon the totality of the surrounding facts"). Again, where the proof fails no case of presumed prejudice can be made. The factors that can be considered in deciding whether prejudice may be presumed include the following:

(1) whether there was a "barrage of inflammatory publicity immediately prior to trial amounting to a huge ... wave of public passion;"

(2) whether the news accounts were primarily factual, because such accounts tend to be less inflammatory than editorials or cartoons; and

(3) whether the media accounts contained inflammatory, prejudicial material not admissible at trial.

*Daniels,* 428 F.3d at 1211 (citing *Ainsworth,* 138 F.3d at 795). Cases considering presumed prejudice do not suggest that the list of factors to be considered is exclusive; the inquiry in every case boils down to whether the pretrial publicity is so prejudicial as to render it impossible, given the circumstances, for the defendant to receive "a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin,* 366 U.S. at 722, 81 S.Ct. 1639 (1961). Nonetheless, the factors identified by the Ninth Circuit provide a useful framework for conducting the required analysis, which involves consideration of complex and interrelated factual and legal questions.

## B. Application of the Presumed Prejudice Factors

Before examining the quantity and quality of the materials that are claimed to

Advisory Committee's Notes to Rule 21, Fed. R.Crim.P. (1944).

establish presumed prejudice it is first necessary to define the terms of the discussion. I have examined the content of the articles as set forth below. To define some measurable guide to categorize the information I have used five phrases that are deemed to be "words of art" in this opinion and the attached appendices. All relate to consideration of "prejudice."

By prejudice I mean harm resulting from a potential juror's/reader's exposure to "evidence" or news that is persuasive but inadmissible, or that so arouses the emotions that calm and logical reasoning is abandoned. It must be kept in mind that the assertion of presumed prejudice almost means that actual prejudice is nearly irrefutable regardless of when the case is tried.

In this case I categorize the articles, books and television accounts as factual, primarily factual, prejudicial, primarily prejudicial, and non-prejudicial. The information or articles characterized as factual are literally messages, usually straight news stories, that report fact. Articles categorized as primarily factual include news reports that are factual but that contain references (usually few in number) that are potentially prejudicial. These are typically straight news stories containing quotes that suggest prejudice. Articles in the prejudicial category include feature stories, letters to the editor, editorials and television reports that imply or suggest

guilt, greed or illicit motives. The primarily prejudicial category includes news stories where the prejudicial content overshadows otherwise factual reporting, such that the overall tone of the article is prejudicial. The non-prejudicial category exists for those opinion pieces and other articles that are not straight news stories and therefore cannot be accurately characterized as factual, but that do not contain prejudicial material.[11]

With these definitions in mind, it is necessary to analyze the proof presented in support of the Defendants' argument for legally presumed prejudice in this case.

### 1. The Quantity and Timing of Pretrial Publicity

■ There has been a significant amount of media coverage of the asbestos contamination in Libby, as is reflected in the factual findings set forth in Part III above. According to Dr. Bronson, a total of 861 articles[12] appeared in the newspapers of the Missoula Division between November 20, 1999 and July 20, 2005.[13,14] The Defendants have offered a sampling of broadcast news coverage, and introduced at the hearing a local news feature that aired in Missoula on November 17, 2005.

The parties disagree over the weight to be accorded to the publicity, particularly with regard to articles that are now several years old. The Defendants urge the

11. These categories figure most prominently in Appendices A and B to this Order, summarizing recent newspaper and television coverage relating to this case.

12. This figure includes four newspapers: The Missoulian (Missoula, MT—360 articles), the Daily Inter Lake (Kalispell, MT—67 articles), the Missoula Independent (Missoula, MT—24 articles), and the Western News (Libby, MT—410 articles). See Bronson Aff. at ¶ 24.

13. The Court notes that this recitation does not constitute a finding that all 861 articles

cited by Defendants are related to the conduct giving rise to the charges in this case. As the government demonstrated at the hearing on the motion to change venue, some of the articles have no relation to this case. See, e.g., Ex. A to Grace's Opening Brief, Missoulian articles Nos. 76, 77, 98 and 161.

14. Exhibit A to Grace's reply in support of its motion to change venue includes an additional 12 articles appearing in Missoula Division newspapers between September 2, 2005 and November 2, 2005.

Court to consider the coverage as a whole, giving equal weight to all articles and television broadcasts regardless of the nature of the article (i.e., straight news story, editorial, letter to the editor, etc.) or the date of publication. The government argues that the Court should give little weight to coverage that took place several years ago and should confine its assessment of prejudice primarily to the more recent publicity. Based upon the burden of proof, the law, and the evidence presented, I find the government has the better argument.

Cases from the United States Supreme Court and the Ninth Circuit hold that the effects of prejudicial publicity are mitigated where a sufficient interval passes between coverage and trial. *See, e.g., Harris*, 885 F.2d at 1362; *Patton v. Yount*, 467 U.S. 1025, 1034–35, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984). This is because a lengthy interval "tends to dissipate the prejudicial impact of media coverage." *United States v. Dischner*, 974 F.2d 1502, 1524 (9th Cir.1992), *overruled on other grounds by United States v. Morales*, 108 F.3d 1031, 1035 n. 1 (9th Cir.1997)(en banc). The Supreme Court, while noting that "[i]t would be fruitless to attempt to identify any particular lapse of time" that in itself would mitigate the effects of prejudicial pretrial publicity, has stated: "That time soothes and eases is a perfectly natural phenomenon, familiar to all." *Patton*, 467 U.S. at 1034–35, 104 S.Ct. 2885. "It is not unusual that one's recollection of the fact that a notorious crime was committed lingers long after the feelings of revulsion that create prejudice have passed." *Id.* at 1035, 104 S.Ct. 2885. Interestingly, the argument in this case is predicated on the notion that most criminal cases involve an isolated identifiable criminal act. Here, the charges relate to a series of events which give rise to legal questions about what inferences or conclusions can be extrapolated from them, including whether or not a crime was committed. Presumptively it was not.

In *Patton*, the defendant, a high school mathematics teacher, confessed to killing a female student. 467 U.S. at 1027, 104 S.Ct. 2885. The confession was reported in news accounts prior to the trial, which resulted in the defendant's conviction. *Id.* The conviction was reversed on appeal because the confession was obtained in violation of the Constitution. *Id.* The defendant was convicted of murder at a second trial after the trial court denied his motion to change venue based on pretrial publicity. *Id.* at 1028, 104 S.Ct. 2885. Although extensive publicity preceded the first trial, the publicity during the year and a half between reversal and the start of the second trial consisted of less than one article per month in each of the two county newspapers and daily summaries of the voir dire process of the second trial. *Id.* at 1032, 104 S.Ct. 2885. After an unsuccessful appeal, the defendant filed a habeas petition which was denied by the district court. The Third Circuit reversed, relying on the Supreme Court's decision in *Irvin* to conclude that a fair trial was rendered impossible by pretrial publicity, which revealed the defendant's confession and his prior conviction.[15] *Id.* at 1029, 104 S.Ct. 2885. The Supreme Court reversed the court of appeals and distinguished its holding in *Irvin*:

> In *Irvin*, the Court observed that it was during the six or seven months immediately preceding trial that "a barrage of newspaper headlines, articles, cartoons and pictures was unleashed against the [the defendant]." In this case, the ex-

---

15. Here the opposite is the case. There are pretrial press releases by W.R. Grace which deny any wrongdoing or criminal culpability.

tensive adverse publicity and the community's sense of outrage were at their height prior to [the defendant's] first trial in 1966. The jury selection for [the defendant's] second trial, at issue here, did not occur until four years later, at a time when prejudicial publicity was greatly diminished and community sentiment had softened.

*Id.* at 1032, 104 S.Ct. 2885 (citation omitted). The *Patton* Court concluded that under the circumstances present in that case the passage of time "clearly rebut[ted] any presumption of partiality or prejudice that existed at the time of the initial trial." *Id.* at 1035, 104 S.Ct. 2885.[16]

In *Harris*, the defendant was convicted and sentenced to death on two counts of murder following the trial court's denial of his motion to change venue. 885 F.2d at 1358, 1360. The Ninth Circuit affirmed a district court's denial of the defendant's habeas petition, basing its decision in part on its conclusion that a sufficient interval had passed between the publicity and the trial. *Id.* at 1362. The pretrial press coverage included the defendant's televised capture for bank robbery; news stories reporting that the defendant and his brother confessed to the crimes; reports that the defendant had previously been convicted of manslaughter; numerous editorials and letters to the editor calling for the death penalty; and a television poll showing overwhelming support for the death penalty in the case. *Id.* at 1360. There were a total of 136 media references

to the case during the five-month span between the defendant's arrest and the trial. *Id.* at 1362. The court noted that the coverage had subsided by the time of trial and concluded that the record revealed neither a barrage of publicity nor a huge wave of public passion. *Id.*

It is quite true that some of the media reports refer to [the defendant's] prior criminal record, and the alleged confession of each brother. These accounts, however, were published within the two weeks immediately following the homicides. The number of news reports regarding [the defendant's] case had dissipated considerably by the time of jury selection four months later.

*Id.*

Other Ninth Circuit cases holding that prejudice dissipates with time include *Randolph v. California*, 380 F.3d 1133, 1142 (9th Cir.2004)("Most of the relevant articles were published at the time Lamont was murdered, six years before the first trial and eight years before the second trial. This length of time helps mitigate any bias the media coverage might have created."); *Dischner*, 974 F.2d at 1523–24 (prejudice caused by 18,000 column inches of news stories, 70 opinion pieces and editorials, and 177 television news stories, would tend to dissipate where it occurred over the span of three years prior to trial); and *Rewald*, 889 F.2d at 864 and n. 28 (rejecting presumed prejudice argument based in part on the court's finding that

---

**16.** The *Patton* Court's holding in this regard is based in part on its review of the voir dire process of the second trial, which revealed a diminished degree of prejudice among the jury pool despite over 98 percent of veniremen reporting that they had heard of the case. 467 U.S. at 1029, 1033–35, 104 S.Ct. 2885. Here the Court has not had an opportunity to assess the actual bias among potential jurors, although such an opportunity would be of great assistance in deciding whether a change of venue is warranted.

This is perhaps why the Ninth Circuit has expressed a preference for deferring determination of a motion to change venue until after voir dire. *See Rewald*, 889 F.2d at 863 (quoting *United States v. McDonald*, 576 F.2d 1350, 1354 (9th Cir.1978)("When a Rule 21(a) motion is made 'the ultimate question is whether it is possible to select a fair and impartial jury, and the proper occasion for such a determination is upon the voir dire examination.' ")).

only 12 of 295 total articles appeared during the seven months prior to trial).

The foregoing cases provide an idea of the interval necessary for prejudice inspired by pretrial publicity to dissipate. Cases in which appellate courts have reversed lower court rulings denying Rule 21(a) motions based on presumed prejudice teach the opposite lesson, as they provide examples in which the interval between coverage and trial is so short that the publicity can be said to have occurred immediately prior to trial. Such cases are rare. The Supreme Court has only once reversed a district court decision for failure to grant a motion to change venue based solely on presumed prejudice. *See Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). The Ninth Circuit has likewise done so only once, in its recent ruling in *Daniels*. Both cases can be distinguished from the issue here.

In *Rideau*, the defendant confessed to bank robbery, kidnaping and murder in an interview with the sheriff. 373 U.S. at 724–25, 83 S.Ct. 1417. Authorities made a film of the defendant's confession, which was elicited in response to leading questions from the sheriff. *Id.* The confession was broadcast on the local television news three times in the days following the defendant's arrest. The defendant's motion to change venue was denied, and he was convicted at trial and sentenced to death. *Id.* The trial took place less than two months after the confession was broadcast. *Id.* at 729, 83 S.Ct. 1417 (Clark, J., dissenting). The Supreme Court, "without pausing to examine a particularized transcript of the voir dire examination of the members of the jury," reversed the conviction on the ground that forcing the defendant to stand trial in a community tainted by viewing his filmed confession constituted a denial of due process. *Id.* at 727, 83 S.Ct. 1417. The Court held that the broadcasts of the confession, which were viewed by approximately 100,000 people in a parish of 150,000, had rendered the trial a "hollow formality." *Id.* at 726, 83 S.Ct. 1417.

The defendant in *Daniels* was convicted of murdering two police officers. 428 F.3d at 1187. The crime occurred when the officers went to the defendant's home to arrest him following the denial of his appeal of a prior bank robbery conviction. *Id.* The defendant, who had been rendered a paraplegic by police gunfire during the bank robbery, shot and killed both officers using two different guns, including one taken from one of the officers. *Id.* The defendant was convicted after his motion to transfer venue was denied. A federal district court granted in part the defendant's habeas petition, finding that the state trial court's denial of the venue motion violated the defendant's due process rights. *Id.* at 1195. The Ninth Circuit, reviewing *de novo* the record before the state trial court, affirmed the district court's finding that denial of the venue motion violated due process.

The trial in *Daniels* took place 13 months after the shootings. In the meantime, news articles identified the perpetrator as a black paraplegic and recounted the defendant's past criminal offenses. 428 F.3d at 1211–12 (citing *People v. Daniels*, 52 Cal.3d 815, 277 Cal.Rptr. 122, 135–36, 802 P.2d 906 (1991)). The publicity included editorials and letters to the editor calling for the defendant's execution. *Id.* The panel's findings in *Daniels* are largely devoid of specifics regarding the quantity and timing of prejudicial articles, save for two instances of publicity as the trial approached:[17]

---

17. The lack of specificity is due to the fact that the news coverage was not included in the record on appeal, leaving the panel with no choice but to rely on the factual findings of the California Supreme Court. 428 F.3d at 1210–11.

Although the publicity diminished after [the defendant's] arrest, it resumed as trial approached. Three months before the trial, news articles covered the local school board's proposal to rename its football stadium in honor of [one of the slain officers]. One month before [the defendant's] trial was to begin, on the anniversary of the killings, a statue commemorating fallen police officers was unveiled by the county. The publicity surrounding the memorial and its unveiling ceremony largely referred to [the slain officers]. The memorial statue, standing nine feet tall, was located across the street from the Riverside County courthouse where [the defendant] was tried.

*Id.* at 1211 (citations omitted).

A review of the press coverage in this case shows that the pattern of publicity is more like that of *Patton* and *Harris* than *Rideau* and *Daniels*. Of the articles published in the Missoula Division's newspapers since November 20, 1999, 88 percent were published prior to September of 2003, three years before the scheduled start of the trial in this case.[18] In the past eighteen months, a total of 79 related articles have appeared in Missoula Division newspapers, for an average of just over one article per paper per month during that span.[19] If the Libby-based Western News, with a circulation of only 4,200, is removed from the total, the Missoula Division is left with 49 articles appearing in the past year and a half.

The tale of television news stories in that span is nearly the same. The record shows 42 television news stories in the past ten months, although many of those are duplicate stories run during multiple newscasts in a single day or by multiple network affiliates on the same day.[20,21] Of those stories, 23 appeared in February and March of 2005 and relate to the filing of the Indictment, the Defendants' entry of pleas of not guilty, and the March 9 Scheduling Conference. Thus, in the past eight months, a total of 19 news stories have appeared on all Missoula Division television stations combined. No stories aired from April through July. Two stories aired in August. Sixteen stories aired in September dealing with the response to the audit conducted by HNA/Triveris, the administrator of the Grace-funded health plan for Libby.[22] No stories appeared in October and one story appeared in November.[23]

18. *See* Exhibit A to Grace's Opening Brief and Exhibit A to Grace's Reply Brief. This figure does not include articles published after November 2, 2005, as any such articles are not in the record. The calculation also excludes the 27 articles in the record for which there is no date of publication.

19. This statement is not meant to imply that all 79 articles are addressed to the topic of this criminal prosecution. As is discussed in greater detail in Part IV.B.2 below, many of the articles bear at best a tangential relation to this criminal prosecution.

20. Two of the television news stories listed by the Defendants were broadcast by a local news station in Spokane, Washington. *See* Items 1 and 4 contained in Exhibit B to Grace's Opening Brief. There is no evidence in the record that those stories reached a Montana audience.

21. Examples of duplicate stories include the following items in Exhibit B to Grace's Opening Brief: Items 6, 8, and 9, aired in February of 2005; and Items 17, 18, 21, 22, and 23, aired in March of 2005. Exhibit H to Grace's Reply Brief contains duplicate stories at Items 12, 15 and 16, apparently aired in September of 2005 (dates are not provided for the broadcasts attached to Grace's Reply Brief).

22. As a result of the audit some covered individuals received letters informing them that HNA/Triveris does not consider them to be suffering from an asbestos-related condition. *See generally* Exhibit A to Grace's Reply Brief.

23. Exhibit B to Grace's Opening Brief also includes one political advertisement (No. 26).

The media coverage described above is not a "barrage" of publicity "immediately prior to trial." The coverage fails to show evidence of an existing "wave of public passion" regarding this case. Evidence of a barrage of publicity in this case exists, but the barrage occurred in the years 2000 and 2001, when local newspapers ran hundreds of articles on the asbestos contamination in Libby. News coverage has decreased since that time, as is evident from the graph contained in Government's Exhibit No. 1 presented at the hearing on this motion.

In my view Dr. Bronson's opinion that the coverage of this case is likely to greatly intensify as the trial draws near is wrong. *See* Bronson Aff. at 9. My independent review of all print and television publicity for the past year and a half convinces me that the level of public interest in this case is not high enough to sustain continued coverage absent some new undisclosed development. In only six of the past 18 months has the combined number of articles appearing in all Missoula Division papers exceeded three. In each case, the increase in coverage was triggered by a new development in the Libby story. There were six total articles in November of 2004, the same month that Grace issued a press release stating that it was under investigation by a federal grand jury.[24] Nine combined stories appeared in December of 2004, coinciding with two Libby-related developments: the Montana Supreme Court held that miners may sue the state for failure to warn them of the dangers of asbestos, and a state-funded actuarial study released an estimate of the costs of health care for Libby's asbestos victims.[25] February of 2005, during which the Defendants were indicted and entered their pleas, saw 20 total articles.[26] Nine articles appeared in March of 2005, a month that featured both the scheduling conference in this case and a proposal by Senator Baucus for a bill requiring Grace to compensate asbestos victims.[27] The eight articles appearing in April of 2005 dealt primarily with changes proposed that month to pending federal asbestos litigation reform legislation intended to help asbestos victims in Libby.[28] September of 2005 saw eight articles, most of which were related to the HNA/Triveris audit letters mailed that month.[29]

In the remaining 12 months, including five of the past six, three articles or fewer were published each month between the four newspapers. This shows a low level of sustained interest in this case.[30] Moreover, many of the events that triggered the isolated spikes in coverage have no direct relation to this case. Reports on pending legislation and health care costs mention the criminal indictment in passing, if at all. The record is devoid of any print news stories primarily concerned with this case after March of 2005. Television news coverage has likewise dropped off since last

---

24. *See* Western News No. 371; Missoula Independent No. 19; Daily Inter Lake No. 55.

25. *See* Western News Nos. 373–74; Daily Inter Lake No. 59; Missoulian Nos. 332, 334.

26. *See* Western News Nos. 375–76, 378–80; Missoula Independent No. 22; Daily Inter Lake Nos. 61 and 62; Missoulian Nos. 335–36, 338–42.

27. *See* Western News Nos. 382–86; Missoulian Nos. 345–47.

28. *See* Western News Nos. 387–89; Missoula Independent No. 23; Daily Inter Lake No. 63; Missoulian No. 349.

29. *See* Western News Nos. A–7 and A–8; Daily Inter Lake Nos. A–11 and A–20; Missoulian No. A–12 (citations from Exhibit A to Grace's reply brief in support of its motion to change venue).

30. These findings are summarized in the time line contained in Appendix C to this Order.

spring. This is so despite the issuance in September of an order · restating the Court's expectations regarding public statements by attorneys and the issuance of several key discovery orders in November. These developments in the case received no attention in the local media. This shows that the present level of interest in this case among the readership of local dailies is far lower than the Defendants suggest. Public interest in the case was not of sufficient intensity to fill the courtroom for the hearing on the motion to transfer venue; in fact, the lawyers for the parties outnumbered representatives of the media and other spectators, even in the gallery.

The pace of news coverage over the past year and a half belies Grace's counsel's prediction that local media will "cover this story aggressively." [31] I find no reliable basis in the record for Dr. Bronson's prediction that coverage will intensify over the coming months. There will be some coverage as the trial begins, but the record provides no reason to assume that the procedural questions to be resolved between now and the trial date will garner anything more than passing interest from local news media.

My finding in this regard is at odds with Dr. Bronson's opinion that the extent of the coverage of this case in the Missoula area is "remarkable." *See* Bronson Aff. at 8. Dr. Bronson conducted his quantitative analysis without regard for the elements of the presumed prejudice test. Through a procedure that he concedes was sloppy and rushed,[32] Dr. Bronson conducted a cursory review of hundreds of newspaper articles and a detailed review of only the articles in the Missoulian, apparently giving equal weight to articles regardless of the date of publication. This methodology is incompatible with the presumed prejudice test, which requires a barrage of publicity "immediately prior to trial." *Patton,* 467 U.S. at 1033, 104 S.Ct. 2885; *Harris,* 885 F.2d at 1362. Similar problems arise with Dr. Bronson's opinion that the coverage has established a "story model" within which all new information in the case is understood. The story model concept assumes that the public will retain indefinitely any initial feelings of bias aroused by prejudicial coverage. Case law directs courts to make the opposite assumption: "It is not unusual that one's recollection of the fact that a notorious crime was committed lingers long after the feelings of revulsion that create prejudice have passed." *Patton,* 467 U.S. at 1035, 104 S.Ct. 2885. Dr. Bronson's findings are of little assistance in applying the presumed prejudice factors. Expert testimony can be helpful, but it is less so when the theories underlying the expert's conclusions are implicitly rejected by the controlling legal standard. *See supra* note 8.

The Defendants contend that the Ninth Circuit's recent decision in *Daniels* requires a transfer of venue in this case. I find there is ample ground for distinguishing the facts in *Daniels* from those present here. At the hearing on the present motion, Grace's counsel characterized the *Daniels* opinion as an "aggressive application of the statute (sic) to deal with what the Court perceived to be an extreme case on the facts." [33] It is. The Court in *Daniels* was forced to rely on a far more generalized factual record than the one in this case. There were many instances of prejudicial coverage cited in the record, but little indication of the timing of the

---

**31.** Transcript of Argument Post–Testimony on Dec. 1, 2005, p. 17.

**32.** *See* Transcript of Bronson Testimony on Dec. 1, 2005, pp. 31–36.

**33.** Transcript of Argument Post–Testimony on Dec. 1, 2005, p. 10.

coverage relative to the trial. 428 F.3d at 1211–12. Those incidents the timing of which was known occurred within three months and one month of the trial. *Id.* The *Daniels* Court considered all incidents of prejudice together, without regard for the date of occurrence, in concluding that the public response constituted "a 'huge' wave of public passion." *Id.* In this case, the degree of detail in the factual record allows for a more precise application of the presumed prejudice test. That application does not support a finding of a presently existing barrage of publicity or a huge wave of public passion.

There is a more fundamental reason why the *Daniels* opinion offers little guidance here. Although it purports to apply the presumed prejudice test, 428 F.3d at 1211, the *Daniels* opinion appears to conflate elements of the tests for presumed prejudice and actual prejudice. After a discussion of the publicity and prejudicial events prior to trial, the Daniels Court goes on to consider the evidence of the effects of the coverage on the jurors:

> That the news coverage saturated the county is reflected in the fact that eighty-seven percent of the jury pool recognized the case from the media coverage. Two-thirds of those empaneled remembered the case from the press accounts—some recalled that the suspect was a Black paraplegic, others recalled that police officers were shot, and two jurors remembered [the defendant] by name.

428 F.3d at 1211–12. This type of evidence is ordinarily considered in deciding the question of actual prejudice, which requires a showing that jurors demonstrated "actual partiality or hostility that could not

be laid aside." *See Harris*, 885 F.2d at 1363.

The *Daniels* panel concludes: "The nature and extent of the pre-trial publicity, *paired with the fact that the majority of actual and potential jurors remembered the pretrial publicity* warranted a change of venue." 428 F.3d at 1212 (emphasis added). It is unclear whether this language in *Daniels* is simply an unartful application of the presumed prejudice test or whether it announces a new test for transfer of venue that combines elements of the presumed prejudice and actual prejudice tests. If it is the former, it bears little weight in relation to the great many Ninth Circuit cases applying the presumed prejudice test without considering the results of voir dire. If on the other hand it is the latter, and there is a new test for transfer of venue, *Daniels* is still of limited guidance because this Court has not yet had the opportunity to conduct voir dire and evaluate the results.[34] Thus, regardless of how one chooses to read the *Daniels* opinion, it does not, as the Defendants suggest, compel a transfer of venue at this stage of this proceeding.

With regard to the first factor to be considered in analyzing presumed prejudice, I find based on the record before me that there is not a presently existing barrage of publicity in this case amounting to a huge wave of public passion. Consideration of this factor therefore weighs in favor of denial of the motion to transfer venue.

## 2. The Nature of the Publicity (Factual vs. Prejudicial)

■ A number of Ninth Circuit cases have emphasized the factual nature of

34. The Defendants would argue that voir dire is unnecessary in this case because their telephone polling provides an accurate measure of community sentiment. I do not share the Defendants' view that telephone polling is a

useful substitute for the voir dire process. My experience is that voir dire will yield responses that are more truthful, thoughtful, and reliable than those elicited in response to the questions asked by the Defendants' pollsters.

news coverage in upholding the denial of a motion to change venue. *See, e.g., Ainsworth,* 138 F.3d at 795 (defendant in murder case failed to identify any editorials or other opinion pieces speculating about his guilt and prejudicial information included sympathetic portrayal of victim and recitation of defendant's criminal record); *Gallego v. McDaniel,* 124 F.3d 1065, 1071 (9th Cir.1997) (media accounts primarily factual in murder case where there were no reports of confession and no stories stating or implying an opinion of guilt); *Dischner,* 974 F.2d at 1524 ("the publicity in this case was not of the type that proclaimed the defendants' guilt in advance of the trial and precluded the jurors from independently evaluating the evidence").

After a careful review of the publicity that has appeared over the past year and a half, I find that the coverage of this case is predominately factual in nature. Of the 20 news stories appearing in the Western News during that period, 19 are primarily factual in nature.[35] What little prejudicial content there is in those 19 stories comes entirely from Libby residents and politicians quoted in six of the stories.[36] The one remaining news story is dated March 16, 2005 and covers the Community Advisory Group meeting attended by the United States Attorney's representative in charge of ensuring compliance with the Justice For All Act. *See* Ex. A to Grace's Opening Brief, Western News No. 386. For the reasons set forth in the Order in this case dated September 30, 2005, I consider the effect of this article to be primarily prejudicial. However, the majority of the news stories are not addressed to the criminal charges and refer to them only in passing if at all.[37]

The Western News has run four editorials over the past eighteen months, two of which are prejudicial and two of which are not.[38] Only one of the editorials deals primarily with the criminal prosecution. The Western News has run six letters to the editor, for an average of one appearing every three months. Five of the letters prejudice the Defendants by calling for "old fashioned western justice," advocating that the Defendants be charged with murder, and accusing Grace of corruption and greed.[39]

The Missoula Independent has run a total of seven articles in the past 18 months. Five of the articles are news stories, three of which feature prejudicial material that overshadows the factual content of the stories.[40] The other two articles are features, one of which is prejudicial.[41] The other feature has no relation to this case.[42] The record shows that the Missoula Independent has not run any articles on the criminal charges in the past ten months.

**35.** This Order will distinguish between different types of print publicity by categorizing them as "news stories," "features," "editorials," and "letters to the editor." The term "articles" refers to all types of print publicity.

**36.** *See* Western News Nos. 371, 375–77, and 382; Ex. A to Grace's Reply Brief, No. 7.

**37.** *See* Western News Nos. 370, 373–74, 377, 381–82, 387, 389–91, and Ex. A to Grace's Reply Brief, Nos. 6, 7, and 25.

**38.** *See* Western News No. 385 and Ex. A to Grace's Reply Brief, No. 8 (prejudicial); Western News Nos. 388 and 392 (not prejudicial).

**39.** *See* Western News Nos. 378, 380, and 384; Ex. A to Grace's Reply Brief, Nos. 24 and 26.

**40.** *See* Missoula Independent Nos. 19 and 21 ("[Grace is] responsible for more than 200 deaths"); 22 (many prejudicial quotes, sympathetic portrayal of victims).

**41.** *See* Missoula Independent No. 17.

**42.** *See* Missoula Independent No. 24.

The Daily Inter Lake has run 13 articles in the past 18 months. The Inter Lake coverage includes eight news stories, seven of which are primarily factual in nature.[43] What little prejudice appears in those seven comes from individuals quoted in the news stories.[44] The prejudicial news story deals with the HNA/Triveris audit and is prejudicial in large part because of its headline: "WR Grace to asbestos victims: You're not sick." [45] The Inter Lake coverage includes one feature which is primarily factual,[46] and four editorials, three of which contain limited prejudicial material, although none of the four focus on the criminal charges.[47]

A total of 29 articles have appeared in the Missoulian in the past year and a half. Twenty-two of the articles are news stories, all of which are primarily factual in nature, although there is some prejudicial content in those stories in the form of quotes from Libby residents and others.[48] The Missoulian coverage includes two features, one of which is primarily prejudicial.[49] Four letters to the editor ran in the Missoulian, two of which are prejudicial.[50] There was a single editorial which is not prejudicial.[51] Of the 22 news stories run by the Missoulian, only eight focus on the criminal prosecution.[52]

A tally of the foregoing yields 55 total news stories in the division over the past 18 months, 50 of which are primarily factual in nature. Three of the five features are primarily factual in nature, as are eight of the ten editorials. Seven of the ten letters to the editor are primarily prejudicial. Sixty-three of the seventy-nine total articles are primarily factual in nature.[53]

Of the 42 television news stories in the year 2005, 39 are primarily factual in nature. The three prejudicial stories are news features, two of which appeared on nationwide news programs.[54] The news stories are mostly clustered around three events: the filing of the Indictment in February 2005 (15 stories), the scheduling conference in March 2005 (eight stories), and the HNA/Triveris audit (16 stories). The articles covering the audit bear no direct relevance to this case. Many of the news stories are duplicates run on multiple broadcasts and multiple networks. There is some prejudicial material in the news stories in the form of brief interviews with the handful of demonstrators outside the courthouse, but it is not so prevalent as to overcome the generally factual nature of the reporting.

43. *See* Daily Inter Lake Nos. 56, 57, 61–64; Ex. A to Grace's Reply Brief, No. 5.

44. *See* Daily Inter Lake Nos. 56, 57, and 61.

45. *See* Ex. A to Grace's Reply Brief, No. 11.

46. *See* Daily Inter Lake No. 55.

47. *See* Daily Inter Lake Nos. 58–60; Ex. A to Grace's Reply Brief, No. 20.

48. *See* Missoulian Nos. 336–38, 345, 353; Ex. A to Grace's Reply Brief, No. 12.

49. *See* Missoulian No. 339, dated Feb. 13, 2005 (containing one asbestosis sufferer's fantasy of Grace executives being hanged and another's statement that "Of course [the Defendants] are guilty").

50. *See* Missoulian Nos. 342, 350 (prejudicial); 340, 348 (not prejudicial).

51. *See* Missoulian No. 329.

52. *See* Missoulian Nos. 331, 335–36, 338, 341, 346–47, 352.

53. These findings are summarized in the table contained in Appendix A to this Order.

54. *See* Ex. B to Grace's Opening Brief, Nos. 3 (NBC Nightly News), 5 (CNN—Paula Zahn); and KECI television news feature, air date Nov. 17, 2005.

The most prejudicial story is the local television news feature that aired on KECI–TV two weeks prior to the hearing on this motion, on November 17, 2005. The fourteen-minute feature focuses on the contamination in Libby and the link to Grace's vermiculite mine. It contains interviews with asbestosis sufferers who blame the Defendants for their condition, and cites a tiny fraction of internal Grace documents implying that company officials knew of the dangers to their workforce. The feature closes with a warning to viewers that dangerous asbestos products are still in many homes today and should be removed if discovered.

The KECI feature is the most prejudicial item in the record over the past year and a half. It contains reporting and interviews that, when taken together, strongly expect the viewer to infer the Defendants' guilt. The KECI story is the exception in this case, not the rule. I cannot conclude that a single prejudicial feature outweighs 39 primarily factual television news stories.[55] Nor do I believe that a few prejudicial letters to the editor have a greater impact on readers than 50 primarily factual print news stories.

The coverage in this case is not of the type that "proclaim[s] the defendants' guilt in advance of the trial and preclude[s] the jurors from independently evaluating the evidence." Most of the stories maintain the presumption of innocence. More than half are addressed to matters other than the criminal prosecution, and mention the criminal case in passing if at all. Since the scheduling conference in March, reporting on the criminal prosecution has been insignificant. I find that consideration of the nature of the publicity weighs in favor of denial of the motion to change venue.

### 3. Admissibility of Content of Media Accounts

■ There will inevitably be many motions filed and decided in the case in the coming months. Those rulings, along with other factors, will dictate the scope of admissible material in this case. There is at least one instance in which recent reporting has included inadmissible material. The HNA/Triveris audit, which has been the focal point of the media references related to his case over the past four months, has no relevance to the charges in this case. Any evidence of the audit and the resulting action taken by HNA/Triveris would be inadmissible at trial. It is possible that the sentiments expressed in quotes of Libby residents and activists in news stories would be inadmissible as well, as such sentiments are often prejudicial but carry limited probative value. *See* Rule 403, Fed.R.Evid.

This factor does not weigh heavily in either direction. Because of the substantial amount of relatively recent reporting of the HNA/Triveris audit, I find that this factor weighs slightly in favor of a transfer of venue.

### C. Other Considerations

The parties raise several arguments based on factors not included in the presumed prejudice test. Those arguments are considered below.

### 1. The Effectiveness of Voir Dire in Exposing Bias

The Defendants take a pessimistic view of the Court's prospects for selecting a fair jury through the voir dire process. One of the Defendants' experts, Dr. Vinson, opines that voir dire is ineffective because (1) jurors feel pressure to disavow bias when surrounded by peers in a courtroom

---

55. My findings regarding the content of the television news stories are summarized in the table contained in Appendix B.

setting; (2) jurors have been known to conceal bias in hopes of getting on the jury and influencing the verdict; and (3) the types of questions typically asked on voir dire are ineffective in rooting out bias.

Dr. Vinson's opinions are unpersuasive for two reasons. First, his observations apply to all cases, regardless of the level of publicity. The shortcomings he cites may be exacerbated in well-publicized cases, but they are not unique to such cases. In this sense Dr. Vinson's opinions, if believed, do not provide a reason to transfer venue so much as they provide a reason to lack confidence in the voir dire process generally.[56] Such a lack of confidence has no sound basis in fact, and it certainly does not have a sound basis in law. *See, e.g., Rewald,* 889 F.2d at 863 ("When a Rule 21(a) motion is made the ultimate question is whether it is possible to select a fair and impartial jury, and the proper occasion for such a determination is upon the voir dire examination.") (citation, internal quotation marks omitted).

Dr. Vinson's opinion is also unpersuasive because it assumes a voir dire process very much unlike the one that will be used in this case. Prospective jurors must be engaged in a dialogue about the criminal justice system, the procedural safeguards built into the system, including the presumption of innocence, and the importance of their service as jurors. Veniremen should be required to explain their views; any reservations should be explored in detail. Because I am confident that such a procedure will be effective in identifying biases that cannot be laid aside, I reject the Defendants' argument that the voir dire process cannot be trusted to deliver a fair jury.[57]

---

**56.** *See, e.g.,* Vinson Aff., ¶¶ 18–24, Denis Aff., pp. A–5–A–7, recounting a telephone polling question in which respondents were given the following hypothetical scenario about a "lawsuit involving a large company that went bankrupt:"

> People who invested money in the company's stock are suing former executives of the company. The investors claim that these executives knew of the company's impending bankruptcy and falsified financial documents, then sold their stock at an inflated price.
>
> The investors claim that these executive should be made to pay back the money they made for themselves. The executives claim that they did nothing wrong. They deny that they were personally responsible for the company's collapse. They say that all investments have risks and that these investors should not be blaming others for their losses.
>
> Half of the respondents were asked "a typical judge's voir dire questions." The majority of that half responded that they could be fair and impartial, that they could set aside bias, and that they would reserve judgment. The other half were asked to agree or disagree with statements about the defendants' guilt. A majority of that half agreed that the execu-

tives were engaged in illegal conduct, that the executives should go to prison, and that the investors should get their money back. With regard to these findings Dr. Vinson concludes, "Overall, what we learn from this data is that, *at least in high profile cases such as this hypothetical case,* there is a significant amount of bias revealed in pre-trial surveys of the attitudes and opinions of prospective jurors that is not reflected in answers to typical voir dire questions." (Emphasis added.)

The obvious problem with Dr. Vinson's conclusion is that the hypothetical case used is not "high profile" at all. It is a generic hypothetical. His attempt to confine his conclusion to high profile cases fails entirely. Instead, what the data relied upon by Dr. Vinson shows, if anything, is that voir dire is an ineffective process in all cases. This is the thrust of Dr. Vinson's argument, and inasmuch as authorities higher than Dr. Vinson have reached the opposite conclusion regarding the reliability of the voir dire process, his argument is a weak one.

**57.** If the voir dire process demonstrates a significant amount of deeply held bias among the jury pool, a change of venue based on actual prejudice may be in order. *See Harris,* 885 F.2d at 1363.

### 2. Other Available Means of Ensuring the Selection of a Fair Jury

The United States cites a number of tools that may be used to ensure that biased jurors are identified and removed from the jury pool, including extensive jury questionnaires, individualized and sequestered voir dire, assembly of a larger than normal jury pool, an increased number of peremptory strikes, specific jury instructions, and expansion of the area from which prospective jurors are drawn. Some or all of these tools would tend to increase the reliability of the voir dire process.

### 3. The Risk of Inconvenience Should it Prove Impossible to Seat a Fair Jury

The Defendants urge the Court to consider the inconvenience to the Court and the parties should the voir dire process reveal a hopelessly biased jury pool necessitating a transfer of venue based on actual prejudice. I have done so, and I agree with the Defendants that such a scenario would result in a considerable amount of lost time. It would likely be a matter of a few months before the case could be reset for trial in an alternate venue.

I do not, however, believe it is appropriate for considerations of convenience to inform any aspect of my decision on this motion. This motion presents conflicting concerns both of which are of constitutional origin. The Defendants have a due process right to a fair trial that trumps their Sixth Amendment right to a trial in the state and district where the crime is alleged to have occurred; but this Court remains subject to the requirement expressed in Article III that "[t]he trial of all crimes ... shall be held in the state where the said crimes shall have been committed." Article III does not allow for exceptions based on convenience or expeditiousness. Such exceptions are similarly absent from Rule 21(a). Thus, while not disputing that my intended course involves some risk of inconvenience, I reject any argument that would have me take that risk into account in deciding this motion.

### 4. The Community's Interest in Holding the Trial in the State and District Where the Alleged Offense Occurred

The government urges the Court to consider the interest of the victims and of the citizens of Libby in a trial in the locality in which the alleged crimes took place. It is undisputed that the general policy of our judicial system favors trial of crimes in the locality in which they are committed, and that this preference reflects acknowledgment of the importance of local trials to the community. See, e.g., United States v. Angotti, 105 F.3d 539, 541 (9th Cir. 1997)("Our venue law grows out of important concerns that a criminal jury trial be held near the place where the crime was committed and where prosecution can conveniently proceed."); United States v. Means, 409 F.Supp. 115, 117 (D.N.D. 1976)("The interest of a community that those charged with violations of its laws, be tried in that community, is not a matter to be cast aside lightly."); and Rule 18, Fed.R.Crim.P. The Justice For All Act states that crime victims have a right not to be excluded from any court proceeding and requires courts to make every effort to permit the fullest attendance possible by the victim(s). 18 U.S.C. § 3771(a),(b).

The interests of the community reflected by the authorities cited above are important, but I believe they are fully reflected in the Ninth Circuit's rulings reserving the application of the presumed prejudice principle for "extreme situations." See, e.g., Harris, 885 F.2d at 1361. As a result, I do not believe community interests warrant separate consideration beyond the application of the Ninth Circuit's presumption against transfer of venue based on pre-

sumed prejudice. Community interests certainly do not rise to level of constitutional rights, nor may they serve an equal counterweight to the Defendants' constitutional rights. To hold otherwise would be to betray the purpose of our courts, which is to serve justice without passion or prejudice. Because I believe the interests of the community are properly incorporated into the presumed prejudice test, I reject the government's argument for separate consideration of those interests.

### 5. The Age of the Defendants

The individual Defendants emphasize their age and the likelihood that prison sentences if they are convicted would rob them of their last years of life. The individual Defendants are of advancing age.[58] There is a reasonable likelihood that if convicted, they would spend the rest of their lives in jail. But these facts do nothing to amplify the importance of protecting the Defendants' constitutional rights, which is always paramount in a criminal prosecution. The Defendants' liberty, like that of all men, is precious; but it is no more so because of their ages. Most importantly, at this point they are presumed innocent.

## V. Conclusion and Order

█ The Defendants have failed to meet their burden to demonstrate presumed prejudice in this case. The coverage in this case is largely factual in nature, and most of the publicity occurred years before the scheduled trial date. The record does not show a barrage of inflammatory publicity immediately prior to trial. Nor does there appear to be a presently existing wave of public passion. I am not satisfied that so great a prejudice exists against the defendants that they cannot obtain a fair trial here. The events in Libby have been covered extensively in the local news media over the past six years. But it is not necessary that jurors be totally ignorant of the facts and issues involved in the case. *Murphy v. Florida*, 421 U.S. 794, 800, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). What is required is a panel of impartial, indifferent jurors. *Irvin*, 366 U.S. at 722, 81 S.Ct. 1639. I believe such a panel can be obtained in this District.

Accordingly, IT IS HEREBY ORDERED that the Defendants' motion for a change of venue (dkt ##192, 194) is DENIED.

### Appendix A—Summary of Print Media Coverage in Missoula Division Since June of 2004

Order Denying Defendants' Motion for Change of Venue Based on Presumed Prejudice

The Western News (Libby, MT)

| Ex. No. | Date | Summary | Nature of Item (Factual vs. Prejudicial) |
|---|---|---|---|
| 370 | 6/18/04 | News Story on former Grace employee's challenge to 3–year statute of limitations for worker's compensation occupational disease claims. | Factual |
| 371 | 11/3/04 | News story on Grace press release revealing grand jury investigation. Contains background on Grace's ownership of the Libby mine and the asbestos contamination in Libby. Contains quote from asbestos activist: "The company should have taken responsibility years ago." | Primarily factual with mild prejudicial quotes |

---

**58.** Alan Stringer is 61 years old. Robert Bettacchi is 62 years old. William McCaig, O. Mario Favorito and Robert Walsh are 67 years old. Henry Eschenbach is 71 years old. Jack Wolter is 72 years old.

| | | | |
|---|---|---|---|
| 372 | 12/3/04 | **News story** on Grace bankruptcy papers claiming federal criminal indictment would be forthcoming. Contains brief background on Libby contamination. | Factual |
| 373 | 12/15/04 | **News story** on study's projected costs of health care for those exposed to asbestos in Libby. Contains explanation of costs covered by Grace-funded health plan. | Factual |
| 374 | 12/17/04 | **News story** on Montana Supreme Court ruling that State is not immune from suit by Libby miners claiming it should have warned them of asbestos dangers. Contains brief background on Libby contamination. | Factual |
| 375 | 2/9/05 | **News story** on Indictment. Contains summary of charges and lists potential maximum penalties. Contains quote from U.S. Attorney Mercer ("A human and environmental tragedy" has occurred in Libby") and Senator Baucus ("[W]e're one step closer to holding Grace accountable for what they did"). | Primarily factual with prejudicial quotes |
| 376 | 2/11/05 | **News story** summarizing charges and evidentiary support in the Indictment. Contains repeat of U.S. Attorney Mercer's "human and environmental tragedy" quote. | Primarily factual; mild prejudicial quotes |
| 377 | 2/23/05 | **News story** on proposal to establish asbestos research centers in Missoula and Libby. Reports statement by senator that "more must be done to help people in Libby afford health care after being exposed to deadly asbestos fibers by W.R. Grace." | Primarily factual; one prejudicial reference |
| 378 | 2/25/05 | **Letter to the Editor** arguing that the Defendants should have been charged with murder and advocating "old fashioned western justice on this matter." | Prejudicial |
| 379 | 2/25/05 | **News story** on Defendants' pleas of not guilty. Contains quote from defense attorney stating his client is innocent and "[t]his indictment falsely portrays the facts." | Factual |
| 380 | 2/25/05 | **Letter to the Editor** arguing that state and federal agencies are as culpable as Grace for the contamination in Libby. | Prejudicial |
| 381 | 3/4/05 | **News story** on high school student documentary on asbestos contamination. Focuses on the filmmaking process. | Factual |
| 382 | 3/9/05 | **News story** on proposed federal health trust to help Libby asbestos victims. Article notes that proposal would have Grace paying $250 million into the trust. | Factual |
| 383 | 3/11/05 | **News Story** reporting that a trial date has been set in the criminal case. Contains background on Libby contamination and summary of charges. | Factual |
| 384 | 3/16/05 | **Letter to the Editor** welcoming a "day of judgment" for the Defendants and claiming that it is not necessary to see evidence before concluding that Defendants are guilty. | Prejudicial |
| 385 | 3/16/05 | **Editorial** praising Senator Baucus for health trust proposal but stating that the most likely source of health care funding is a fine resulting from conviction in the criminal case. | Prejudicial |
| 386 | 3/16/05 | **News story** on U.S. Attorney's representative holding meeting in Libby. Contains representative's statement that the definition of "victim" is broad and that the amount of restitution Defendants may be required to pay depends in part on the number of people who sign up as victims. | Prejudicial |
| 387 | 4/15/05 | **News story** on Libby-specific provisions of federal asbestos litigation reform bill. | Factual |
| 388 | 4/20/05 | **Editorial** expressing skepticism over whether proposed asbestos bill will help Libby residents. Contains one reference to "Libby asbestos victims of W.R. Grace's mining and milling operations." | Primarily non-prejudicial; one prejudicial reference |
| 389 | 4/27/05 | **News story** on temporary removal of Libby-specific provisions of asbestos reform bill. W.R. Grace is mentioned one time. | Factual |

| | | | |
|---|---|---|---|
| 390 | 8/12/05 | **News story** on EPA's decision to stop speaking with media due to the ongoing criminal prosecution. | Factual |
| 391 | 8/12/05 | **News story** on the arrival in Libby of a crew working for the ABC news program Nightline. W.R. Grace is mentioned one time. | Factual |
| 392 | 8/12/05 | **Editorial** criticizing the EPA for refusing to speak with media. Contains a single reference to the criminal case. | Non-prejudicial |
| A–3 1 | 9/14/05 | **Letter to the Editor** explaining the purpose and function of the Libby Area Technical Assistant Group ("LATAG"). One reference to W.R. Grace as "the party allegedly responsible for the site." | Non-prejudicial |
| A–6 | 9/21/05 | **News story** on LATAG hiring a community advisor. W.R. Grace is not mentioned. | Factual |
| A–7 | 9/21/05 | **News story** on HNA/Triveris letters. Summarizes content of letters and contains quote from Center for Asbestos Related Disease ("CARD") doctor stating that the administrator is attempting to avoid paying benefits by minimizing ailments. | Factual with mild prejudicial material |
| A–8 | 9/21/05 | **Editorial** criticizing the HNA/Triveris letters. Contains speculation that the audit is intended to allow the Defendants to argue at trial that asbestos has not made people sick in Libby. | Prejudicial |
| A–24 | 10/5/05 | **Letter to the Editor** responding to HNA/Triveris letters. Refers to the health plan administrator as Grace's "prostitute." | Prejudicial |
| A–25 | 10/5/05 | **News story** on scheduled EPA clean-up progress meeting in Libby. W.R. Grace is mentioned one time. | Factual |
| A–26 | 10/7/05 | **Letter to the Editor** from asbestos-related disease victim calling the Defendants greedy and crooked. Tells Defendants, "We victims hope to bear witness when you stand before Him to hear sentence passed." | Prejudicial |

### The Daily Inter Lake—Kalispell, MT

| Ex. No. | Date | Summary | Nature of Item (Factual vs. Prejudicial) |
|---|---|---|---|
| 55 | 11/14/05 | **Feature** on Libby asbestos activists Les Skramstad and Gayla Benefield. Contains one reference to criminal case and Skramstad's statement that Grace is "shirking its duties." | Primarily factual; some prejudicial content |
| 56 | 11/16/04 | **News story** about books and documentaries on Libby contamination. Summarizes the various books and films. Contains one filmmaker's reference to a "W.R. Grace Corp. cover-up" and reports that a former Grace executive "is suspected to have suppressed a federal investigation into Libby's asbestos contamination. | Primarily factual; some prejudicial content |
| 57 | 11/16/04 | **News story** on Kalispell attorneys handling civil suits against Grace. Contains background on asbestos lawsuits and legislation. Contains attorney's statements that Grace's proposed medical trust for victims is "not even close to fair" and that the people of Libby have been "horribly wronged." | Primarily factual; some prejudicial content |
| 58 | 11/17/04 | **Editorial** praising Libby's progress in responding to asbestos contamination. | Non-prejudicial |
| 59 | 12/23/04 | **Editorial** on Montana Supreme Court ruling that State is not immune from suit by Libby miners claiming it should have warned them of asbestos dangers. Urges careful consideration of such suits. Contains a single sentence stating Grace and state and federal agencies share the blame for Libby contamination. | Primarily non-prejudicial; one mild prejudicial reference |
| 60 | 2/1/05 | **Editorial** urging Montana's senators to continue to work for federal asbestos legislation compensating Libby asbestos victims. Contains one reference to "the damage done by Grace." | Primarily non-prejudicial; one mild prejudicial reference |

1. Articles beginning with the letter A are in- cluded in Exhibit A to Grace's Reply Brief.

| 61 | 2/8/05 | **News story** on the federal indictment. Describes indictment as vindication for former union president's crusade to expose Grace. Briefly profiles Defendant Stringer, a former Libby resident. | Primarily factual; several prejudicial references |
| --- | --- | --- | --- |
| 62 | 2/13/05 | **News story** profiling individual Defendants. Includes summary of the criminal charges. | Factual |
| 63 | 4/29/05 | **News story** on changes to federal asbestos compensation bill. One mention of W.R. Grace. | Factual |
| 64 | 5/25/05 | **News story** on inclusion of "Libby fix" is asbestos compensation bill. W.R. Grace mentioned one time. | Factual |
| A–5 | 9/18/05 | **News story** on Libby residents participating in national mesothelioma study. W.R. Grace mentioned one time. | Factual |
| A–11 | 9/25/05 | **News story** on HNA/Triveris letters. Features headline, "W.R. Grace to asbestos victims: You're not sick." Contains quote from asbestos victim and CARD doctor saying Grace intends to use letters to limit liability. | Prejudicial |
| A–20 | 9/29/05 | **Editorial** claiming Grace is trying to limit liability through HNA/Triveris audit. | Prejudicial |

### The Missoula Independent—Missoula, MT

| Ex. No. | Date | Summary | Nature of Item (Factual vs. Prejudicial) |
| --- | --- | --- | --- |
| 17 | 9/9/04 | **Feature** on congressional debate over what diseases will be covered by asbestos bill. Contains sympathetic portrayal of victims. Refers to Grace as "the mining company that knowingly exposed many in the Libby community to asbestos, resulting in more than 200 asbestos-triggered deaths. | Prejudicial material overshadows otherwise factual reporting |
| 19 [2] | 11/11/04 | **News story** on Grace's press release revealing grand jury investigation. States that Grace is "responsible for more than 200 asbestos-related deaths in Libby." | Prejudicial material overshadows otherwise factual reporting |
| 20 | 12/30/04 | **News story** on college survey measuring the use in Libby of wood stoves for heat. | Factual |
| 21 | 12/30/04 | **News story** on the year in review. Contains short capsule about Libby contamination and refers to Grace as "the vermiculite mining company responsible for more than 200 asbestos-related deaths in the community so far." | Prejudicial material overshadows otherwise factual reporting |
| 22 | 2/17/05 | **News story** on federal indictment. Contains prejudicial quotes, erroneous reference to Les Skramstad as a "former Grace worker," sympathetic portrayal of victims. | Pervasive Prejudicial material |
| 23 | 4/21/05 | **News story** highlighting shortcomings in proposed asbestos compensation bill. Contains one reference to Grace offering an activist $600,000.00 "to shut up." | Primarily factual; some prejudicial material |
| 24 | 5/12/05 | **Feature** profiling this Court. No relation to this matter. | Non-prejudicial |

### The Missoulian—Missoula, MT

| Ex. No. | Date | Summary | Nature of Item (Factual vs. Prejudicial) |
| --- | --- | --- | --- |

2. The Defendants have mistakenly dated Item No. 18 in the Missoula Independent collection "10/16/04." The article was printed on October 16, 2003 and is therefore not within the time frame of this Appendix.

| | | | |
|---|---|---|---|
| 327 | 6/7/04 | **News Story** on former Grace employee's challenge to 3–year statute of limitations for worker's compensation occupational disease claims. | Factual |
| 328 | 8/14/04 | **News Story** on EPA head Mike Leavitt's Libby visit. Contains brief background on Libby contamination. | Factual |
| 329 | 8/22/04 | **Editorial** questioning whether EPA head's visit reflects a genuine commitment to cleaning up Libby. Refers to a "disaster" in Libby, deaths from asbestos exposure. W.R. Grace mentioned twice. | Primarily non-prejudicial; one prejudicial reference |
| 330 | 10/14/04 | **News Story** on failure of federal asbestos compensation bill. Grace not mentioned. | Factual |
| 331 | 10/30/04 | **News Story** on Grace press release revealing grand jury investigation. Contains brief background on Grace's ownership of the Libby mine. Refers to court ruling requiring Grace to compensate EPA for Libby clean-up costs. | Factual |
| 332 | 12/10/04 | **News story** on study's projected costs of health care for those exposed to asbestos in Libby. Contains explanation of costs covered by Grace-funded health plan. | Factual |
| 333 | 12/12/04 | **News story** on outgoing Gov. Judy Martz's reflections on her tenure. One brief reference to Martz's use of the state's "Superfund 'silver bullet' in Libby to clean up the mess left by W.R. Grace and Co." | Primarily factual; one prejudicial reference |
| 334 | 12/15/04 | **News story** on Montana Supreme Court ruling that State is not immune from suit by Libby miners claiming it should have warned them of asbestos dangers. Contains brief background on Grace's ownership of the Libby mine. | Factual |
| 335 | 2/8/05 | **News story** on grand jury indictment. | Summarizes charges and evidence in indictment. Factual |
| 336 | 2/8/05 | **News story** on Libby residents' reaction to the indictment. One resident is quoted saying he will reserve judgment until the evidence is presented, but that "the people who did this should be held to the fire." Libby mayor is quoted as saying, "Let's make sure we have the right guys here." | Factual; one mild prejudicial reference |
| 337 | 2/8/05 | **News story** on Libby-specific provisions federal asbestos bill. Story calls bill a "bailout" of asbestos companies. Plaintiff's attorney is quoted referring to "Grace's ruthless conduct in putting profits over the health of its workers." | Primarily factual; one prejudicial reference |
| 338 | 2/8/05 | **News story** on grand jury indictment. Contains summary of charges and background on Libby contamination and Grace's ownership of the mine. Contains quotes from U.S. Attorney Mercer ("A human and environmental tragedy" has occurred in Libby") and Libby resident ("It's criminal how they harmed so many people"). | Primarily factual; two prejudicial quotes |
| 339 | 2/13/05 | **Feature** on Libby residents' reaction to charges. Contains one asbestosis sufferer's fantasy of Grace executives being hanged and another's statement that "Of course [the Defendants] are guilty." | Prejudicial material overshadows otherwise factual reporting |
| 340 | 2/20/05 | **Letter to the Editor** criticizing President Bush. One reference to "Libby's on-going asbestos tragedy." | Primarily non-prejudicial |
| 341 | 2/23/05 | **News story** on Defendants' pleas of not guilty. Summarizes charges in indictment. Contains quotes from one Libby resident remarking on the number of defense attorneys and stating that the Defendants showed "no remorse" in court. | Primarily factual; mild prejudicial references |
| 342 | 2/24/05 | **Letter to the Editor** criticizing President Bush. Accuses Grace of "knowingly endanger[ing] its employees and the community of Libby with deadly asbestos." | Prejudicial |

| 343 | 2/27/05 | **Feature** on Libby's economic struggles. Refers to "deadly asbestos pollution" from Grace's Libby mine. No other references to Grace. | Primarily factual; one mild prejudicial reference |
|---|---|---|---|
| 344 | 2/28/05 | **News story** on economic forces leading to diversification of Libby industry. Contains brief background on the Libby mine. | Factual |
| 345 | 3/5/05 | **News story** on bill to require Grace to pay $250 million into asbestos victims' trust. Contains quote from Sen. Baucus that Grace "has willfully harmed the innocent citizens of Libby." | Primarily factual; one prejudicial reference |
| 346 | 3/9/05 | **News story** on Defendant McCaig pleading not guilty. Summarizes charges in indictment. | Factual |
| 347 | 3/10/05 | **News story** reporting that a trial date has been set in the criminal case. Contains summary of charges. | Factual |
| 348 | 4/7/05 | **Letter to the Editor** criticizing media for failure to alert Libby community to the dangers of asbestos. | Non-prejudicial |
| 349 | 4/13/05 | **News story** on proposed compensation for Libby asbestos victims in federal asbestos bill. Contains brief background on Libby mine and contamination. | Factual |
| 350 | 4/21/05 | **Letter to the Editor** criticizing asbestos bill. Portrays Defendants as greedy executives "laughing all the way to the bank" and calls for corporate accountability. | Prejudicial |
| 351 | 5/20/05 | **News story** on revised estimates for completion of Libby clean-up. Contains brief background on Libby mine and contamination. | Factual |
| 352 | 5/24/05 | **News story** reporting trial date set for September 11, 2006.[3] | Factual |
| 353 | 6/25/05 | **News story** on EPA nominee's law firm's ties to Grace. Contains quotes from Libby activist accusing Grace of filing for bankruptcy to avoid its "moral obligations." | Factual; one prejudicial reference |
| 354 | 7/20/05 | **News story** on Sen. Baucus' decision to oppose confirmation of EPA nominee whose law firm lists Grace as a client. | Factual |
| A–12 | 9/26/05 | **News story** on HNA/Triveris letters. Contains sarcastic quotes by Libby residents saying Grace has "waved their hand across Libby and said, 'You're healed.'" | Primarily factual; some prejudicial quotes |

## Appendix B—Summary of 2005 Broadcast Media Coverage in Missoula Division
### Order Denying Defendants' Motion for Change of Venue Based on Presumed Prejudice

| Ex. | Date | Station/ Location | Summary | Nature of Item (Factual vs. Prejudicial) |
|---|---|---|---|---|
| 1 | 2/07/05 | KHQ/ Spokane | **News story** on federal Indictment. Contains brief profile of a Libby asbestos victim whose family lives in Spokane, including quote by one family member saying Grace must accept the consequences of "putting profit over people." | Primarily factual; one prejudicial quote |
| 2 | 2/05 (exact date unknown) | Fox News/ national | **News story** on federal Indictment. Contains summary of charges and background on dangers of Libby vermiculite and resulting health problems. | Factual |
| 3 | 2/05 (exact date | NBC Nightly News/ national | **News story** on federal Indictment. Contains background on extent of health problems in Libby. One asbestosis sufferer in- | Prejudicial content overshadows otherwise |

**3.** Although this story ran on May 24, 2005, the September 11, 2006 trial date was set more than two months earlier by written Or-der dated March 15, 2005. *See* docket entry No. 91.

| | | | | |
|---|---|---|---|---|
| unknown) | | | terviewed says that he "won't be around for grandkids." Libby resident Gayla Bene-field says the Defendants are "getting what they deserve." | factual report-ing |
| 4 | 2/08/05 | KHQ/ Spokane | **News story** on Indictment. Content of the story identical to Ex. # 1. | Primarily factu-al; one prejudi-cial quote |
| 5 | 2/05 (exact date unknown) | CNN/ national | **Feature** on health problems in Libby. De-scribes Grace's conduct as a "corporate cov-er-up." Contains extensive background on the nature of the lung problems caused by asbestos and interviews with doctors from Libby. Contains a summary of the criminal charges. One doctor says Grace "isn't pro-viding the medical care" it had promised to Libby residents. A victims wife says of the Indictment, "It's about time somebody has to come forward and face what they've done." | Prejudicial con-tent oversha-dows otherwise factual report-ing |
| 6 | 2/22/05 | KCFW/ Kalispell | **News story** on Defendants' pleas of not guilty. Contains a brief recitation of the charges. A victim's sister interviewed out-side the courthouse says, "Somebody needs to be held accountable." | Primarily factu-al; one prejudi-cial quote |
| 7 | 2/22/05 | KECI/ Missoula | **News story** on Defendants' pleas of not guilty. Contains a brief recitation of the charges. | Factual |
| 8 | 2/22/05 | KECI/ Missoula | **News story** on Defendants' pleas of not guilty. Content of the story identical to Ex. # 6. | Primarily factu-al; one prejudi-cial quote |
| 9 | 2/22/05 | KECI/ Missoula | **News story** on Defendants' pleas of not guilty. Content of the story identical to Ex. # # 6, 8. | Primarily factu-al; one prejudi-cial quote |
| 10 | 2/22/05 | KFBB/ Great Falls | **News story** on Defendants' pleas of not guilty. Contains a brief recitation of the charges. A Libby resident interviewed out-side the courthouse says the Defendants "should realize the damage they've done." | Primarily factu-al; one prejudi-cial quote |
| 11 | 2/22/05 | KPAX/ Missoula | **News story** on Defendants' pleas of not guilty. Contains a brief recitation of the charges and a summary of charged conspir-acy. A victim interviewed outside the courthouse asks, "How could people do that to other humans?" | Primarily factu-al; one prejudi-cial quote |
| 12 | 2/22/05 | KTMF/ Missoula | **News story** on Defendants' pleas of not guilty. Content of the story is identical to Ex. # 10. | Primarily factu-al; one prejudi-cial quote |
| 13 | 2/22/05 | KTVM/ Bozeman | **News story** on Defendants' pleas of not guilty. Content of the story identical to Ex. # # 6, 8, and 9 except that this story con-tains no interviews. | Factual |
| 14 | 2/22/05 | KTVQ/ Billings | **News story** on Defendants' pleas of not guilty. Content of the story identical to Ex. # 11. | Primarily factu-al; one prejudi-cial quote |
| 15 | 2/22/05 | KXLF/ Butte | **News story** on Defendants' pleas of not guilty. Contains a summary of the charges in the Indictment. A Libby resident inter-viewed attributes the Libby contamination to the Defendants' greed and lack of compassion. | Primarily factu-al; one prejudi-cial quote |

| | | | | |
|---|---|---|---|---|
| 16 | 3/9/05 | KCFW/ Kalispell | **News story** on tentative trial date set at scheduling conference. Demonstrators were interviewed outside the courthouse, including one who accused the Defendants of "mass murder" and one asbestos disease sufferer who said, "I hurt for my kids and my wife." | Primarily factual; some prejudicial quotes |
| 17 | 3/09/05 | KPAX/ Missoula | **News story** on tentative trial date set at scheduling conference. Contains footage of demonstrator shouting "Rot in hell!" at a defendant outside the courthouse. Another demonstrator says of the Defendants, "They knew about this." | Primarily factual; some prejudicial quotes |
| 18 | 3/09/05 | KPAX/ Missoula | **News story** on tentative trial date set at scheduling conference. Content of the story is identical to Ex. # 17. | Primarily factual; some prejudicial quotes |
| 19 | 3/09/05 | KTVM/ Bozeman | **News story** on tentative trial date set at scheduling conference. Content of the story is identical to Ex. # 16. | Primarily factual; some prejudicial quotes |
| 20 | 3/09/05 | KWYB/ Butte/ Bozeman | **News story** on tentative trial date set at scheduling conference. Contains summary of charges. Contains footage of demonstrator shouting "Rot in hell!" at a defendant outside the courthouse. Interviewed demonstrator says, "I'm dying from [asbestosis]," and says of the Defendants, "These people need to be held accountable." | Primarily factual; some prejudicial quotes |
| 21 | 3/09/05 | KXLF/ Butte | **News story** on tentative trial date set at scheduling conference. Content of the story is identical to Ex. # # 17–18. | Primarily factual; some prejudicial quotes |
| 22 | 3/10/05 | KTVQ/ Billings | **News story** on tentative trial date set at scheduling conference. Content of the story is identical to Ex. # # 17–18, 21. | Primarily factual; some prejudicial quotes |
| 23 | 3/10/05 | KXLF/ Butte | **News story** on tentative trial date set at scheduling conference. Content of the story is identical to Ex. # # 17–18, 21–22. | Primarily factual; some prejudicial quotes |
| 24 | 8/17/05 | KECI/ Missoula | **News story** on asbestos fibers detected in ash from mill fire in Missoula. Reports on precautionary steps taken by health officials to prevent exposure to asbestos. Briefly mentions asbestos problem in Libby and the pending charges against Grace. | Factual |
| 25 | 8/18/05 | unknown (NBC station) | **News story** on asbestos fibers detected in ash from mill fire in Missoula. Reports that danger from ash is low. Mentions the Libby mine as an example of asbestos exposure. | Factual |
| 26 | unknown | unknown | **Political advertisement.** Accuses Grace of spreading asbestos around Libby, lying and killing people. Intended to persuade viewers to oppose asbestos litigation reform bill. | Prejudicial |
| H–1[1] | unknown | unknown (ABC station) | **News story** on HNA/Triveris audit letters. Broadcast is cut short due to technical problem. | Factual |

1. News broadcasts beginning with the letter H are included in Exhibit H to Grace's Reply Brief. The exact dates of the broadcasts included in Exhibit H are unknown, but they are all assumed to have appeared in September of 2005.

| | | | | |
|---|---|---|---|---|
| H–2 | unknown | KECI/ Missoula | **News story** on HNA/ Triveris audit letters. A former Grace worker is quoted as saying that the letters are an effort by Grace to limit its financial responsibility. | Factual |
| H–3 | unknown | KECI/ Missoula | **News story** on HNA/ Triveris audit letters. Summarizes the content of those letters which informed participants that the company did not believe their illnesses are as serious as previously thought. A former Grace worker is interviewed and says the company is "trying to back away from responsibility" for health care costs in Libby. | Primarily factual; one prejudicial quote |
| H–4 | unknown | KPAX/ Missoula | **News story** on HNA/ Triveris audit letters. Summarizes the content of those letters which informed participants that the company did not believe their illnesses are as serious as previously thought. Les Skramstad is interviewed saying the letter (sent to his wife) "makes me damn angry." Story notes that Grace did not send the letters. | Primarily factual; one prejudicial quote |
| H–5 | unknown | KECI/ Missoula | **News story** on HNA/ Triveris audit letters. A nurse is quoted saying it is impossible for an asbestos-related lung condition to improve. | Factual |
| H–6 | unknown | KECI/ Missoula | **News story** on HNA/Triveris audit letters. Content is a combination of Ex. # # H–3 and H–5. | Primarily factual; one prejudicial quote |
| H–7 | unknown | KPAX/ Missoula | **News story** on HNA/ Triveris audit letters. Content of the story is identical to Ex. # H–4. | Primarily factual; one prejudicial quote |
| H–8 | unknown | KPAX/ Missoula | **News story** on a proposal by Sen. Baucus in response to the audit letters to require Grace to fund a $250 million medical trust for Libby asbestos victims. | Factual |
| H–9 | unknown | KULR/ Billings | **News story** on a proposal by Sen. Baucus in response to the audit letters to require Grace to fund a $250 million medical trust for Libby asbestos victims. Also reports Rep. Rehberg's call for an investigation of HNA/Triveris. Contains brief background on Libby contamination. | Factual |
| H–10 | unknown | KTVQ/ Billings | **News story** on a proposal by Sen. Baucus in response to the audit letters to require Grace to fund a $250 million medical trust for Libby asbestos victims. Contains interview in which Sen. Baucus says, "W.R. Grace tells people they're not sick . . . they're clearly sick." Also reports Rep. Rehberg's call for an investigation of HNA/Triveris. | Primarily factual; one prejudicial quote |
| H–11 | unknown | unknown (ABC station) | **News story** on a proposal by Sen. Baucus in response to the audit letters to require Grace to fund a $250 million medical trust for Libby asbestos victims. | Factual |
| H–12 | unknown | KPAX/ Missoula | **News story** on interview with a doctor involved in the HNA/ Triveris audit. Doctor says that many x-rays and chest scans he reviewed showed no sign of asbestosis. | Factual |

| | | | | |
|---|---|---|---|---|
| H–13 | unknown | KPAX/ Missoula | **News story** on a proposal by Sen. Baucus in response to the audit letters to require Grace to fund a $250 million medical trust for Libby asbestos victims. Content of story is identical to Ex. # H–10. | Primarily factual; one prejudicial quote |
| H–14 | unknown | KECI/ Missoula | **News story** on reaction to HNA/ Triveris letters among congressional delegation. A spokesperson describes Rep. Rehberg as "outraged" and reports that Rehberg has called of an investigation of HNA/ Triveris. | Factual |
| H–15 | unknown | KPAX/ Missoula | **News story** on interview with a doctor involved in the HNA/ Triveris audit. Content of story identical to Ex. # H–12. | Factual |
| H–16 | unknown | KPAX/ Missoula | **News story** on interview with a doctor involved in the HNA/ Triveris audit. Content of story identical to Ex. # # H–12, H–15. | Factual |
| D–9 [2] | 11/17/05 | KECI/ Missoula | **Feature** on Libby asbestos contamination and Grace's involvement. Strongly implies that the Defendants are culpable for the asbestos contamination in Libby. Contains a sympathetic portrayal of asbestosis sufferer and former vermiculite mine worker Les Skramstad, and interviews with Libby residents who hold Grace responsible for the contamination. Relying on documents purporting to be internal company memoranda from Grace, the broadcast implies that the company was aware of the dangers posed by conditions in the Libby Mine, yet never told the miners about those dangers. | Prejudicial |

2. Defendants' Hearing Exhibit # 9, played in its entirety at the hearing on December 1, 2005.

**APPENDIX C**

Order Denying Defendants' Motion for Change of Venue Based on Presumed Prejudice

Appendix C - Time line of print media coverage in the Missoula Division from June 2004 to November 2005

Montana Supreme Court rejects state immunity from asbestos warning suits; revised Libby health care estimates released

Scheduling conference; trial date set

HNA/Triveris audit letters mailed

Grace issues press release on grand jury investigation

Indictment filed; Defendants enter not guilty pleas

Federal asbestos reform bill undergoes revisions

| | June 2004 | July | Aug | Sept | Oct | Nov | Dec | Jan 2005 | Feb | Mar | Apr | May | June | July | Aug | Sept | Oct | Nov |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 2 | 0 | 2 | 1 | 2 | 6 | 9 | 0 | 20 | 9 | 8 | 3 | 1 | 1 | 3 | 8 | 3 | N/A |
| WN | 1 | 0 | 0 | 0 | 0 | 1 | 3 | 0 | 6 | 6 | 3 | 0 | 0 | 0 | 3 | 4 | 3 | N/A |
| MS | 1 | 0 | 2 | 0 | 2 | 0 | 3 | 0 | 10 | 3 | 3 | 1 | 1 | 1 | 0 | 1 | 0 | N/A |
| MI | 0 | 0 | 0 | 1 | 0 | 1 | 2 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | N/A |
| IL | 0 | 0 | 0 | 0 | 0 | 4 | 1 | 0 | 3 | 0 | 1 | 1 | 0 | 0 | 0 | 3 | 0 | N/A |

WN = Western News MS = Missoulian MI = Missoula Independent IL = Daily Inter Lake